**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **RONALD CRENSHAW,** | § | |
| **Petitioner** | § | |
| | § | |
| **VS.** | § | **C.A. NO. C-04-683** |
| | § | |
| **DOUG DRETKE, DIRECTOR,** | § | |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE–INSTITUTIONAL DIVISION,** | § | |
| **Respondent** | § | |

## MEMORANDUM AND RECOMMENDATION

Petitioner is an inmate in the Texas Department of Criminal Justice - Institutional Division, ("TDCJ-ID"), and currently is incarcerated at the Allred Unit in Iowa Park, Texas. The actions about which he complains took place in Nueces County, Texas. Proceeding *pro se,* petitioner filed this habeas corpus petition pursuant to 28 U.S.C. § 2254 on December 24, 2004 (D.E. 1). Petitioner claims that he was denied effective assistance of counsel at both the guilt/innocence and punishment stages of his trial and also that he was denied due process of law when the state courts failed to adjudicate his state application for habeas corpus relief. Respondent filed a motion for summary judgment on May 16, 2005 to which petitioner responded on May 31, 2005 (D.E. 19, 21). Petitioner filed his own motion for summary judgment on June 7, 2005 (D.E. 22).

## BACKGROUND

### A. Procedural History

Following a plea of not guilty, petitioner was tried in front of a jury in the 148th District Court of Nueces County, Texas, which found him guilty of robbery and of being an habitual felony offender. On September 15, 2000 the jury assessed punishment at 53 years incarceration in TDCJ-

ID (Ex Parte Crenshaw, App. No. 56,896-02 at 367-368, 386-389).[1]  Petitioner filed a motion for new trial on October 12, 2000, asserting that the verdict was contrary to the law and evidence, that the court committed material error and that trial counsel was ineffective (State v. Crenshaw, No. 99-CR-3969-E (S1) at 148-152).  The trial court held a hearing on the motion and denied it on November 2, 2000 (13 SF 1-88; State v. Crenshaw, No. 99-CR-3969-E (S1)).  Petitioner filed a direct appeal and his conviction was affirmed by the 13th Court of Appeals on May 23, 2002 (Crenshaw v. State, No. 13-00-692-CR (May 23, 2002)(not designated for publication)).  Petitioner filed a petition for discretionary review which was refused by the Texas Court of Criminal Appeals on December 4, 2002 (Crenshaw v. State, PDR No. 1500-02).

Petitioner filed an application for habeas corpus relief in state court on February 22, 2004 which was denied without written order by the Texas Court of Criminal Appeals on November 24, 2004 (Ex Parte Crenshaw, App. No. 56,896-02 at 2, cover).  He filed this instant petition for habeas corpus relief on December 24, 2004 (D.E. 1).  Respondent concedes that petitioner has exhausted his state court remedies.

**B.  Statement of Facts**

At trial Patricia Lazo testified that on December 25, 1999 she had picked her mother up at a nursing home for Christmas dinner and was taking her back to the nursing home, located at the corner of Third and Elizabeth Streets at about 8:00 p.m. (8 SF 134-136).  After helping her mother into her room, Lazo returned to the car, got in and put her purse beside her on the seat (8 SF 142, 144).  She was driving her sister's car, a 1987 blue Buick (8 SF 135-136).  She pulled out of the nursing home parking lot onto Third intending to turn right onto Morgan (8 SF 148).

---

[1]The state court records are located at D.E. 20.  "SF" refers to the statement of facts.

As Lazo approached the light at Morgan, she felt something pushing into her back and then a man grabbed her from behind, put his right arm around her neck, said he had a gun and told her to drive (8 SF 148-149).  As she drove down Morgan he told her several times to drive down side streets, but instead she headed toward Staples hoping there would be more people around.  She drove erratically in an effort to draw attention to herself.  She saw a truck stopped at a traffic light on Morgan and decided to run into it.  She did so, and her assailant told her to get out of the car, which she did.  She did not see her assailant's face but as she got out of the car she noticed that he had on a blue jacket (8 SF 150-151, 155, 180).   She described it as a dark blue nylon windbreaker (8 SF 172-173, 180-181).

Lazo ran up to the truck she had hit and saw that the man in the truck was already calling the police.  She saw the man in her car move to the front seat, put the car in reverse and drive off (8 SF 151, 156).  She told the man in the truck that she needed help because the man in her car had a gun.  The driver of the truck told Lazo that he could see that a police car was already pursuing her car (8 SF 158).

Later that evening Lazo was taken to her vehicle, which the driver had crashed into a fence (8 SF 162, 9 SF 85-87).  Her purse was sitting on the trunk, along with its contents, including her driver's license, checkbook, keys, pager, money and credit cards (8 SF 163-165).  Lazo never identified her assailant because she never saw him (8 SF 167).

Damon Sahadi testified that he and his fiancé, Angela Burns, were stopped at the intersection of Staples and Morgan when his black Dodge Ram truck was hit from behind.  He turned and looked behind his truck and saw one person tumble out of the left side of the vehicle and another person jump from the back seat to the front seat and drive off (8 SF 188-190, 194).  Sahadi thought it was about 7:00 p.m. and thought that there was still a little bit of light left in the

3

sky (8 SF 190, 208, 224).  After his truck was hit, he reached for his cell phone and called the police, and about that time Lazo started beating on his truck window and screaming hysterically. He reported the accident as a hit and run to the police dispatcher (8 SF 191-192).  Lazo was screaming, "He has a gun!"  Sahadi saw the man's face as he sat in the front seat.  Then, the car backed up and sped off, going around them into the oncoming traffic lane and heading west toward the Crosstown Expressway (8 SF 194, 196, 199, 201-202, 212).  As the car passed him, it was about ten or 15 feet away and Sahadi was able to see the side of the man's face (8 SF 213).  The man appeared to be wearing a large, dark blue, down-filled jacket that had white and light blue lettering (8 SF 214-216).  Sahadi identified petitioner as the man driving the car (8 SF 219-220).

Sahadi watched the car drive through the Staples intersection and saw a police car make a U-turn and begin to pursue it.  (8 SF 202-204).  Sahadi called the police dispatcher again because he wanted the officer to know that the driver of the car had a gun (8 SF 202).  The incident, from the time he was hit until the car drove off, felt like it took five minutes, but it could have been a much shorter period of time (8 SF 197-198).

Daniel Sanchez, a police officer, testified that he was patrolling on South Alameda Street on the night of the incident when he heard the police dispatcher announce that all patrols should be on the look out for a gray Buick.  Shortly thereafter he heard another officer, Giles, say over the radio that he was in pursuit of the vehicle (9 SF 13-15).  Sanchez was northbound on South Alameda and realized from the radio dispatch that Giles and the Buick were coming his way so he turned his lights off and waited until they crossed the intersection in front of him (9 SF 17). Seconds later Sanchez saw the Buick run a stop sign and cross Alameda followed by a patrol car (9 SF 18-20).  Sanchez followed and became the second officer in the pursuit (9 SF 21).  During the pursuit, the furthest Sanchez was from the Buick was about one half a block.  Sanchez was

4

unable to see who was driving the Buick or how many people were in the car (9 SF 23, 26).  The

chase ended when the Buick ran into a fence at the corner of 15th Street and Coleman.  Sanchez did

not see the Buick hit the fence but saw Giles make a right hand turn onto Coleman and heard him

say over the radio that the car had hit the fence and then Giles said, "Black man running."  Sanchez

turned right onto Coleman and saw a black man running toward him on the sidewalk (9 SF 26-30,

32-33).  He did not see anyone else at the scene (9 SF 32-33).  Sanchez stopped his car and began

to chase the man on foot.  The man was wearing a dark blue one-piece jumpsuit and a light weight

blue jacket.  He was not carrying anything in his hands (9 SF 33-34).  Sanchez pursued the man for

about 75 feet and then grabbed him by his clothes and forced him to the ground (9 SF 36-37).

Officer Giles came up and helped Sanchez lift the man up to his feet (9 SF 39).  Sanchez released

the man to Giles for transport to the county jail (9 SF 40).  Sanchez identified the man he caught as

petitioner (9 SF 41-42).

Officer David Giles testified that on the night of the incident he was patrolling with a

civilian ride-along, his father-in-law Charles Barker.  He was driving east on Morgan,

approaching Alameda at about 8:00 p.m. when someone passed him at a high rate of speed heading

west on Morgan (9 SF 66-68).  Giles saw that the driver was a dark-complected man (9 SF 71).

Giles made a U-turn to follow the car because he assumed that the man was driving while

intoxicated (9 SF 72).  Giles began chasing the car through the neighborhood and they were

traveling between 60 and 65 miles per hour (9 SF 75-78).  The chase ended when the car hit a

curb and came to a stop at the corner of 15th Street and Coleman.  Giles was six or seven car

lengths behind the car at the time of the accident and he saw it occur (9 SF 85).  Immediately after

the car stopped Giles' view was obscured for a few seconds by dust and smoke (9 SF 86-87, 90).

He turned right onto Coleman and saw a man running from the scene carrying a purse, which he

5

threw down on a gravel or caliche driveway (9 SF 88-89, 92).  He followed the running man in his

car and caught up to him and the man looked at him.  Giles pulled his car in front of the man, who

started running back to the west on the same sidewalk toward Sanchez (9 SF 90-91, 94-95).  Giles

exited his car and began chasing the man, but Sanchez had grabbed him (9 SF 95).  Giles

recovered the purse which had been thrown down on Coleman (9 SF 98).  The man was arrested

for reckless driving and evading arrest (9 SF 101).  He was wearing blue overalls and a gray shirt

or sweater (9 SF 114).

Fletcher Hopkins II, a crime scene technician, testified that he arrived at about 8:30 p.m. at

the scene where the Buick had collided with a hurricane fence (9 SF 139, 143).  He photographed

the scene and processed the inside and outside of the car for fingerprints (9 SF 139, 146, 149,

150).  He obtained latent prints from inside the car and submitted them to a lab, but no

identification was made from them (9 SF 153-155).  Hopkins did not process Lazo's purse for

fingerprints and he did not process the interior of the car for hair or particles of any kind (9 SF

160, 162).  Nor did he process the petitioner's clothing for any type of fibers from the car (9 SF

163).  Hopkins said it was a mistake for him not to process the purse and the driver's license for

latent prints, but it was improbable that he would have obtained usable prints from the purse (9 SF

165).

John Lay, a patrol officer, testified that when he arrived at the scene of the crash, two

officers had petitioner down on the ground (9 SF 172).  He found Lazo's drivers license, credit

cards and some additional items on the ground in the gutter right behind the car (9 SF 176-177).

Lay estimated the car was going 40 or 45 miles per hour when it hit the curb.  He did not think an

occupant of the car would have suffered a very strong impact because there was only minor

damage to the front of the car from hitting the chain link fence (9 SF 183-184).

Billy Collins, a patrol officer, testified that he arrived at the scene after the chase and he searched the car to see if there was a gun or anything else that would help in the investigation (9 SF 191).  He then received a call indicating that he should go to the scene of the first accident and prepare a report about it (9 SF 195).  He spoke to Lazo at that scene (9 SF 197).

Heleodoro Cantu, a patrol officer, testified that he arrived on the scene after Sanchez had petitioner handcuffed (9 SF 205).  Cantu and other officers found a purse and some other items and began collecting them.  There was a trail of items from the car to where petitioner was caught (9 SF 206-208).  Shortly thereafter Cantu received a call to go to the scene of the first accident to interview Lazo (9 SF 210).  Cantu also spoke to Sahadi and Burns, but neither were able to give a good description of Lazo's assailant (9 SF 221).  Cantu called Lazo's husband and then took Lazo to Coleman street where she identified the car and her purse (9 SF 223).  Lazo told Cantu that after she rammed the truck, her assailant crawled out of the back seat into the street and then into the front seat before driving off (9 SF 232).

### C. Petitioner's Claims

Petitioner claims that he was denied effective assistance of counsel because of the following actions of his trial counsel.  (1) Counsel failed to object during voir dire when the prosecutor asked potential jurors how they felt about repeat or habitual felony offenders; (2) Counsel did not strike a juror who said she could not remain impartial after learning that petitioner had a criminal history; (3) Counsel failed to ask potential jurors if they knew anything about the case from reports in the news media; (4) Counsel failed to call several witnesses who would have been helpful to petitioner, namely Angela Burns and Melissa Vetor; (5) Counsel failed to adequately investigate the case prior to trial and failed to interview Burns, Vetor or Damon Sahadi; (6) Counsel failed to cross-examine and impeach witnesses with their written statements;

7

(7) Counsel failed to object to the in-court identification of petitioner by Sahadi; (8) Counsel failed to pursue exculpatory evidence; (8) Counsel failed to object to the witness list; (9) Counsel failed to request a mistrial when the jury was deadlocked; (10) Counsel failed to object to the out-of-state pen packets prior to trial; (11) Counsel failed to object to the state's exhibit which consisted of plaintiff's booking photograph and (12) Counsel failed to argue effectively at the hearing on the motion to suppress.  Petitioner also complains that his right to due process was violated when the state court did not properly adjudicate his application for writ of habeas corpus.

Respondent counters that petitioner has failed to meet his burden of proof under 28 U.S.C. § 2254(d) of AEDPA, failed to demonstrate that the denial by the state court was unreasonable, and failed to state a claim based on his assertion that the state courts did not  properly adjudicate his claim.

## APPLICABLE LAW

### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state prisoner may not obtain relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) (West 1996).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or

if the state court decides a case differently than the Court on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from the Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.  Williams v. Taylor, 529 U.S. 362, 412-413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d (2000).

Although "unreasonable" is difficult to define, the Supreme Court noted that it is an objective, rather than subjective standard, and emphasized that there is a critical difference between an unreasonable application of federal law and a merely "incorrect" or "erroneous" application of federal law.  Neal v. Puckett, 239 F.3d 683, 687 (5th Cir. 2001)(citing Williams, 120 S.Ct. at 1522-1523).  A federal court has no authority to grant habeas corpus relief simply because it concludes in its independent judgment that a state court's judgment is erroneous or incorrect.  Neal, 239 F.3d at 687.  In determining whether a state court decision in a habeas case is reasonable, the focus is on the ultimate legal conclusion reached by the state court and not on whether the state court considered and discussed every angle of the evidence.  "[T]he only question for a federal habeas court is whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'"  Neal, 239 F.2d at 696 (citing Hennon v. Cooper, 109 F.3d 330, 334-335 (7th Cir. 1997)).

In petitioner's case, the Texas Court of Criminal Appeals denied petitioner's application for habeas corpus relief without written order (Ex Parte Crenshaw, App. No. 56,896-02, at cover).  In Texas writ jurisprudence, a denial of relief rather than "dismissal" of a claim by the Court of Criminal Appeals generally disposes of the merits of a claim.  Singleton v. Johnson, 178 F.3d 381, 384 (5th Cir. 1999).  Accordingly, petitioner must show that the denial of habeas relief in state court was contrary to, or involved an unreasonable application of, clearly established Federal

law, or was based on an unreasonable determination of the facts in light of the evidence.  28 U.S.C. § 2254(d).

## B.  Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, a petitioner must meet the two-prong test set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  He must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable.  Id., 466 U.S. at 687-688, 104 S.Ct.at 2064.  Petitioner must show "significant prejudice" in a noncapital context.  Armstead v. Scott, 37 F.3d 202 (5th Cir. 1994)(citing Spriggs v. Collins, 99 F.2d 85, 88, n. 4 (5th Cir. 1993)).  Prejudice in this context means that the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

In Strickland, the Supreme Court made clear that judicial scrutiny of counsel's performance must be highly deferential and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.  A court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  A petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omission were outside the wide range of professionally competent assistance.  Id., 466 U.S. at 690, 104 S.Ct. at 2066.

### (1) Motion to Suppress

Petitioner argues that his attorney failed to move to suppress the victim's purse found by Officer Giles near the scene of petitioner's arrest (D.E. 2 at 55-57).  But petitioner failed to articulate any legal theory which would have supported suppression of the purse.  He argues that Officer Giles planted the purse (D.E. 2 at pp. 36-37), and that the lack of a clear chain of custody and the failure of evidence technicians to check the purse for fingerprints rendered the purse evidence unreliable (D.E. 2 at pp. 32, 56-57).  Petitioner's argument would not affect admissibility of the purse; rather it would affect the weight or significance a jury might attach to the evidence.  *Lockhart v. McCotter*, 782 F.2d 1275, 1280-81 (5th Cir. 1986).  Trial counsel was not ineffective for failing to pursue suppression of the purse.  In fact trial counsel took advantage of this weakness in the state's case and argued during his closing that the purse had not been properly preserved as evidence and that it had not been dusted for fingerprints (10 SF 19).  Petitioner's claim fails.

### (2) Voir Dire

Petitioner claims that his counsel failed to object during voir dire when the prosecutor asked potential jurors how they felt about repeat or felony offenders and that his counsel did not strike a juror who said she could not remain impartial after learning that petitioner had a criminal history.  The record shows that the prosecutor explained the penalty range to the jury, including the range for someone who has previously been convicted of a felony.  The prosecutor asked the jurors if they could consider the full range of punishment for such a person and all answered affirmatively (8 SF 67-70).  Petitioner's counsel subsequently asked whether any jurors' assessment of the evidence or the burden of proof would be affected by the knowledge that a

defendant had been previously convicted of a felony (8 SF 94-95).  Petitioner asserts that these questions and comments tainted the presumption of innocence at the trial.

Under Texas state law, when prior felony convictions are alleged for purposes of enhancement, the enhancement paragraph generally may not be read to the jury until the punishment phase of the trial.  TEX. CODE CRIM. PROC. ANN. art. 36.01(a)(1).  The statute does not, however, prevent the trial court or prosecutor from informing the jury in hypothetical terms of the applicable range of punishment if the State proves any prior convictions for enhancement purposes.  Johnson v. State, 901 S.W.2d 525, 532 (Tex. App. – El Paso 1995, pet. ref'd)(citing Frausto v. State, 642 S.W.2d 506, 509 (Tex. Crim. App. 1982)).  Accordingly, counsel's failure to object to the discussion in hypothetical terms of a defendant's prior felonies was not ineffective assistance of counsel.

During voir dire, six jurors responded that information about previous convictions would affect their assessment of the evidence in a defendant's case (8 SF 94-99).  One of the jurors went on to serve on the jury and petitioner asserts that she should have been struck by counsel.  Petitioner's claim fails because he has made only a conclusory allegation that had the juror been struck, the outcome of his trial would have been different.  "Mere conclusory allegations do not raise a constitutional issue in a habeas proceeding."  Schlang v. Heard, 691 F.2d 796, 798 (5th Cir. 1982).  Also, nothing in the record indicates that the jury heard any evidence of any of petitioner's prior convictions during the guilt or innocence phase of the trial.  Even if the juror would have looked more harshly at a defendant with previous felony convictions, she had no occasion to do so in petitioner's case because she heard no evidence of any previous convictions.  Petitioner has not shown that his counsel was ineffective under these facts.

Petitioner also asserts that his attorney was ineffective during voir dire because he failed to question the jury panel about whether any of them had heard media reports about the case. He attached a copy of a short newspaper article about the incident that appeared in the Corpus Christi newspaper approximately nine months before his trial (D.E. 1, Ex. G-1). The newspaper article was brief and factual and did not contain any information that did not come out at trial. Petitioner did not describe any prejudice he suffered from his counsel's failure to ask about pre-trial publicity. Accordingly, he has failed to show that his counsel was ineffective for not questioning the jury about pre-trial publicity.

### (3) Pre-trial Investigation

Petitioner asserts that his counsel failed to adequately investigate the case prior to trial and failed to interview Angela Burns, Melissa Vetor or Damon Sahadi. Under <u>Strickland</u>, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment's." <u>Strickland</u>, 466 U.S. at 691, 104 S.Ct. at 2066.

At the motion for new trial, petitioner's counsel testified that to prepare for the trial, he and his investigator went to the scene of the arrest and to the nursing home where Lazo had dropped off her mother. He also interviewed petitioner's former attorney and met with the attorney's investigator three or four times. Counsel also met with petitioner on many occasions. Petitioner's counsel received copies of all the discovery from the prosecutor's office. He did not interview Burns, Vetor or Sahadi (<u>Ex Parte Crenshaw</u>, App. No. 56,896-02 at 284-285). He explained that in his experience, witnesses often will not talk to defense attorneys and that if they do interview a witness and something comes out that further damages the case for the defendant, the witness will

13

call the District Attorney's office and report the damaging information to the prosecutor (Id. at 48). Giving the attorney the deference he is due under Strickland, it cannot be said that his decision not to interview the witnesses directly was ineffective assistance of counsel.

Petitioner also complained that his attorney did not call Burns or Vetor to testify at trial. Counsel explained that he did not call Vetor, a witness at the scene of the first accident, because he did not think her testimony would have aided petitioner's case to any significant degree (Id. at 306). At the motion for new trial, Vetor testified that shortly before Lazo crashed her car into Sahadi's truck, she (Vetor) was driving down Morgan when the car driven by Lazo almost sideswiped her twice before falling back behind her (13 SF 29). After Lazo's car struck Sahadi's truck, Vetor saw a man and woman get out of the car on the driver's side and saw the man push the woman before climbing back in the car and taking off. Vetor said the man stood by the car for about a minute before getting back in and taking off. Vetor was unable to describe the man, but she thought he was wearing a brown bulky coat and did not recall that he was wearing overalls (13 SF 30, 36).

Petitioner asserts that because Vetor's testimony was inconsistent with Sahadi's testimony regarding how the assailant moved from the back seat to the front seat and also regarding what he was wearing, that she should have been called to testify to impeach Sahadi's identification of petitioner. However, petitioner has failed to show that if Vetor had testified that it would have changed the outcome of the trial. Vetor testified that she was wearing tinted prescription glasses and looking through her tinted windshield and that she was at least three car lengths behind Lazo's car (8 SF 32-33, 35). Just because Vetor was not able to identify petitioner does not mean that Sahadi could not do so. Also, the fact that their stories about how the assailant moved from the back seat to the front seat are inconsistent is immaterial because all the witnesses agreed that the

14

assailant moved into the front seat and drove off.  Petitioner's counsel was not ineffective for failing to call Vetor to testify.

The same is true for witness Angela Burns.  She was in the front seat of Sahadi's truck when it was hit.  She was unable to identify the person who drove Lazo's car from the scene but there is no indication that her testimony would have helped petitioner's case in any way. Petitioner cannot show that failure to call these two witnesses amounted to ineffective assistance of counsel.

### (4) Cross-examination and Impeachment of Witnesses

Petitioner claims that all of the police officers' testimony was inconsistent with their written reports and he argues that his counsel should have impeached their testimony with the reports.  Although petitioner points out the inconsistencies, none is material to the outcome of the case because none casts doubt on the crux of this case--that petitioner was apprehended while running away from the scene of the second car wreck and that at least one police officer saw him throw Lazo's purse to the ground.  Without a specific assertion of how these inconsistencies affected the outcome of this case, petitioner cannot prevail on this point.

### (5) In-Court Identification

Petitioner complains that because Sahadi was not able to provide a good description of him at the scene of the first wreck, his attorney should have objected to the in-court identification Sahadi made of petitioner at the trial.  The factors to be considered by a court when deciding whether to admit identification testimony are (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the description; (4) the witness' level of certainty and (5) the time between the identification and the

confrontation.  <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

Petitioner cites the testimony of officer Cantu, who said that Sahadi could not identify anyone on the night of the incident (9 SF 221).  However, Sahadi testified that he twice was able to see the assailant clearly–once when the assailant was climbing over the seat of the car and again when he drove around Sahadi's truck.  He also testified that he gave a description of the man to police and was able to describe a black man wearing a big jacket (8 SF 212-214; 9 SF 6).  Given that testimony, there is no reason to believe that the court would have sustained an objection to the in-court identification had trial counsel made one.  Moreover, trial counsel cross-examined Sahadi about his ability to see the assailant that evening and in his closing argument he pointed out the weaknesses in Sahadi's identification testimony (10 SF 23).  Based on the record of the identification, petitioner cannot show that his counsel was deficient.

### (6) Failure to Pursue Exculpatory Evidence

Petitioner argues that his counsel should have introduced the clothing he was wearing on the night of the incident because several witnesses said the assailant was wearing a bulky coat but when petitioner was arrested he was wearing a pair of brown shoes, coveralls and a gray long-sleeve shirt made out of a woven material (13 SF 5).  The clothing was available on the day of trial but petitioner's counsel chose not to move that it be admitted into evidence (13 SF 6-7).

At the motion for new trial, petitioner's attorney explained that he did not seek to admit the clothes because he thought the gray shirt reasonably could have been seen as a jacket.  Instead, he decided to highlight throughout the case that the prosecution could not present the jacket which witnesses testified the assailant had been wearing.  "'A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless

16

it is so ill chosen that it permeates the entire trial with obvious unfairness.'" Lave v. Dretke, 416

F.3d 373, 380 (5th Cir. 2005)(citing United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002)).

Counsel in this case made a strategic decision to highlight the absence of the jacket rather than take

a chance that the shirt could be seen as a jacket.  Petitioner's claim that his decision amounted to

ineffective assistance of counsel is without merit.

**(7) Failure to Object to Witness List**

Petitioner argues that his attorney should have objected to the testimony of Sahadi and

police officer J.R. Lay because although their names were on a witness list, they did not have

written statements or reports on file.  Petitioner cited no law to support his contention that these

witnesses should have made available some sort of written statement or report and no such

authority was found.

Petitioner also complains that his counsel should have objected to the testimony of Brenda

Gatewood because her name was not on the witness list.  Gatewood testified at the punishment

phase of the trial that petitioner's fingerprints matched those in the penitentiary packets used for

enhancement purposes.  In order to show ineffective assistance of counsel, petitioner must show

not just that the lack of objection was an error but that the failure to object was so serious as to fall

below an objective standard of reasonableness and thereby prejudice the defense.  Thacker v.

Dretke, 369 F.3d 607, 614 (5th Cir. 2005).  Petitioner argues that had Gatewood not been allowed

to testify because her name was not on the witness list, the prosecution would not have been able

to prove the enhancement allegations and the punishment range applicable to petitioner would have

been two to 20 years.  Petitioner offers no more than a conclusory allegation about the outcome of

the trial had counsel objected.  Petitioner's trial counsel had prior knowledge that the prosecutor

intended to introduce evidence of petitioner's habitual felony and repeat felony offender status and

so was not prejudiced by Gatewood's testimony.  (See Crenshaw v. State, No. 99-CR-3969-E,

November 9, 2000, appellate record at 30.)  Nothing in the record indicates that the objection

would have been sustained.  Accordingly, petitioner cannot show that his counsel's performance

was inadequate in this regard.

### (8) Failure to Request a Mistrial

Petitioner also complains that his counsel failed to request a mistrial when the jury sent out

a note that it was deadlocked during the punishment phase of the trial.  At that point, the jury had

been deliberating for less than two hours and the court advised the jurors to keep deliberating (

D.E. 1, Ex. B1; 12 SF 23).  Petitioner cannot show that even if counsel had sought the mistrial, that

it would have been granted at that point in the proceeding.  His counsel was not deficient for

failing to seek one.

### (9) Failure to Object to Out-of-State Pen Packets

Petitioner argues that his attorney should have objected to the out-of-state penitentiary

packets which were submitted as proof that petitioner was an habitual felony offender.  The record

reflects that he did.  During the punishment phase, trial counsel objected to one of the out-of-state

indictments and convictions because of a discrepancy between the language of the enhancement

paragraph and the actual conviction, and the objection was sustained (11 SF 10-12, 20, 23-24).

Counsel also objected to the evidence regarding another felony conviction because it

appeared that the conviction had been reversed and that petitioner had pleaded guilty to a lesser

offense but was released for time served (11 SF 20-23).  The trial court overruled the objection

(Id.).  The appellate court affirmed the trial court's ruling, holding that the evidence was sufficient

to permit a reasonable jury to find beyond a reasonable doubt that petitioner was convicted of

Robbery on October 23, 1986 (D.E. 2 at Exh. C).  Petitioner has not articulated any theory under which the prior conviction could or should have been excluded.  This claim is without merit.

**(10) Failure to Object to Introduction of Booking Photograph**

Petitioner argues that his attorney should have objected to the introduction of the booking photograph because it was taken 10 to 12 hours after he was arrested and he had just woken up from a heavy sleep.  Petitioner has failed to show how the presence of the photograph in evidence harmed him in any way and his counsel was not deficient for his failure to object to it.

**C.  State Habeas Proceedings**

Petitioner argues that the state trial court failed to properly adjudicate his habeas corpus claim when he filed his motion under TEX. CODE CRIM. PRO. art. 11.07, but this claim is not reviewable in a federal habeas petition.  Federal habeas relief does not lie for errors of state law and it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  When conducting a habeas review, the state court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 474, 480, 116 L.Ed.2d 385 (1991).  Accordingly, this claim should be denied.

**D.  Certificate of Appealability**

The Supreme Court has stated that the showing necessary for a Certificate of Appealability ("COA") is a substantial showing of the denial of a constitutional right.  Hernandez v. Johnson, 231 F.3d 243, 248 (5th Cir. 2000)(citing Slack v. McDaniel, 529 U.S. 473, 483-484 (2000)).  Under that standard, an applicant makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could

resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further.  See Clark v. Johnson, 202 F.3d 760, 763 (5th Cir. 2000).  Specifically, where a district court has rejected a prisoner's constitutional claims on the merits, the applicant must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  Slack, 529 U.S. at 484.  A determination of the merits of a claim should not be part of the decision to issue a COA. Rather, it is the debatability of the underlying constitutional claim, rather than its resolution, that controls whether a COA should issue.  Miller-El v. Cockrell, 537 U.S. 332, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

If the district court orders that petitioner's cause of action be dismissed, and petitioner seeks a COA in order to proceed with his case, it is further recommended that the COA be denied because he has not made the necessary showing for issuance.

## RECOMMENDATION

Based on the foregoing, it is recommended that respondent's motion for summary judgment (D.E. 21) be granted and petitioner's motion for summary judgment (D.E. 22) be denied. Petitioner's cause of action for habeas corpus relief should be denied.  It is further recommended that should petitioner file a motion for a Certificate of Appealability that it be denied.

Respectfully submitted  this 14th day of September, 2005.


B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

20

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1)(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Services Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).